Ira LEIGHTON, Petitioner,

v.

W. S. NEIL, Warden, Tennessee State Penitentiary, Nashville, Tennessee, Respondent.

Civ. No. 5604.

United States District Court, M. D. Tennessee, Nashville Division.

Aug. 10, 1970.

Lloyd Comer, Lawrenceburg, Tenn., for petitioner.

David M. Pack, Atty. Gen. State of Tenn., and Bart Durham, Asst. Atty. Gen., Nashville, Tenn., for respondent.

## ORDER

WILLIAM E. MILLER, Circuit Judge (sitting by designation).

In this action petitioner's application for habeas corpus seeking to void a 99-year sentence imposed upon him after a conviction in the state court for first degree murder was heard before the Court on April 14, 1970.

The petition presents the Court with the difficult and anomalous situation in which both the trial judge who presided at petitioner's criminal trial and the special prosecuting attorney have now stated that petitioner did not receive a fair trial.

The facts are these. Petitioner was arrested on January 12, 1943, in Lawrenceburg, Tennessee, and charged with assault and battery. At the time petitioner was between seventeen and nineteen years of age. He was arrested by the Sheriff of Lawrence County, Clive Weathers, and a Tennessee Highway Patrolman, Gregg O'Rear. He was taken to the Lawrence County jail where a county squire orally committed petitioner to jail. There is some evidence that there had been enmity between petitioner and Sheriff Weathers arising out of several previous encounters. At the jail petitioner was lodged in a large cell with George Newell, the individual with whom petitioner had earlier been involved in an altercation resulting in his arrest. After the two men resumed their fight, petitioner was removed to another cell.

Shortly thereafter, Sheriff Weathers entered petitioner's cell. All witnesses at the criminal trial agreed that petitioner asked the sheriff not to come into the cell. Petitioner has testified in an earlier hearing, the record of which is before this Court, that the sheriff was carrying a blackjack when he entered the cell. Other witnesses have stated that they did not see whether the sheriff was carrying a blackjack. Petitioner has always contended that the sheriff began to beat him with the blackjack and that he thereupon defended himself by striking at the sheriff with a small knife he had secreted on his person. At the criminal trial the State sought to prove that petitioner struck at the sheriff and that the sheriff defended himself with the blackjack. The sheriff died almost immediately from the knife wounds inflicted by petitioner. Testimony is uncontroverted that when the sheriff died he held a blackjack in his hand.

Following the incident, petitioner was taken to the Davidson County jail, Nashville, Tennessee, for his safety. After being returned to Lawrenceburg, defendant was indicted for murder in the first degree on January 14, 1943. There being no attorney in Lawrence County willing to undertake the petitioner's defense at that time, counsel was appointed from another county. One week after the killing, a motion for change of venue was heard and overruled on January 19, 1943. Trial commenced in Lawrenceburg on February 1, 1943, and, after a lengthy voir dire in which nearly three panels of veniremen were called, the presentation of the case culminated in a conviction and a sentence of 99 years in the state penitentiary. Mr. Noble L. Freeman, an experienced member of the Lawrence County bar, served as special prosecutor for the State at the request of the family of Sheriff Weathers.

Petitioner won his release in 1966 after applying for post-conviction relief in the Circuit Court of Lawrence County before Judge Joe M. Ingram, the judge who had presided at the 1943 trial. This decision was reversed by the Tennessee

Supreme Court on the ground that Judge Ingram should have recused himself. A rehearing was ordered before a different judge. Leighton v. Henderson, 220 Tenn. 91, 414 S.W.2d 419 (1969). On rehearing, the petition for a writ of habeas corpus was denied, and this denial was later affirmed by the Tennessee Court of Criminal Appeals. State ex rel. Leighton v. Henderson, 448 S.W.2d 82 (Crim.App.1969). A writ of certiorari to the state Supreme Court was denied on December 1, 1969. Having exhausted his state remedies, petitioner now seeks the writ of habeas corpus in this Court.

Petitioner has presented the Court with several allegations of denial of due process of law in his criminal trial going to the problems of the speed with which he was brought to trial, the alleged prejudicial climate of the community, and the right to have competent counsel. In view of the entire record, including all the state post-conviction proceedings, the original trial, and the hearing here, the Court feels that the disposition of this case turns primarily on the question whether conditions in Lawrence County at the time of trial were so prejudicial to petitioner's rights that he was as a matter of law denied a fair trial when his motion for a change of venue was denied. It is the opinion of the Court that petitioner has failed to sustain the burden of proof on this issue.

The denial of a motion for change of venue in face of substantial antagonism toward a defendant approaching the proportions of mob violence was considered in Bard v. Chilton, 20 F.2d 906 (6th Cir. 1927). That case held that where issues as to the right to a change of venue had been decided adversely to petitioner on appeal to the state's highest court, those issues were not open to the federal court in a habeas corpus case unless the district court could find upon the facts presented as a matter of law, that the conditions in the community were so prejudicial that petitioner did not receive a fair trial. Bard v. Chilton, *supra*, has been cited by later courts in support of the proposition that a federal court

should regard habeas corpus as an extraordinary writ not to be used to reverse the highest court of a state on questions of trial error in the absence of narrowly viewed constitutional defects. A case noting Bard v. Chilton, *supra* to this effect is Jones v. Commonwealth, 97 F.2d 335 (6th Cir. 1938). In *Jones,* appellant had been convicted of murder and sentenced to death in Kentucky. The state attorney general later expressed the strong opinion that the defendant had been convicted on perjured testimony, yet the Court of Appeals of Kentucky declined relief and relegated defendant to an appeal for executive clemency. The district judge deciding the habeas corpus petition limited himself to issuance of a letter of probable cause, doubting the "power and the propriety of a single district judge to reverse the decision of the highest court of the state." 97 F.2d at 336. On appeal the Sixth Circuit noted the extraordinary nature of the writ and the caution with which it should be granted, but found that more than commission of error of law was involved. Rather a wrong of constitutional proportions so as to render the trial and conviction void required the court to reverse the district court. In is notable that evidence given by the state's attorney general was afforded great weight by both the district judge and the Sixth Circuit.

Another case demonstrates the same pattern. In Fleenor v. Hammond, 28 F.Supp. 625 (W.D.Ky.1939) the district judge had declined to issue a writ, citing Bard v. Chilton, *supra*, and Jones v. Commonwealth, *supra*, and entered a letter of probable cause. As in *Jones,* the Sixth Circuit, upon review of the facts, found a fundamental violation of due process exceeding the commission of an error of law and reversed the district court, ordering a remand so that petitioner could amend. Fleenor v. Hammond, 116 F.2d 982 (6th Cir. 1941). These cases indicate the responsibility of the district judge for restricting the issuance of the writ to clear violations of due process of law. A more recent

case following this pattern is Odom v. Nash, 226 F.Supp. 855 (W.D.Mo.1964), where it was held that a failure to grant a change of venue did not constitute a deprivation of due process even though there had been substantial television coverage, since the coverage was found to be factual and not prejudicial in the community.

In recent years the problem of venue as depriving a defendant of a fair trial has arisen primarily in cases involving prejudicial pre-trial publicity that was claimed to have created an atmosphere too hostile and antagonistic to afford a fair trial. In Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) the Supreme Court stated that it was not enough to show a possibility of prejudice during the course of a trial to render it invalid, but the prejudice itself must be shown. In that case there was substantial evidence before the court of the highly prejudicial effects of the pre-trial newspaper publicity. The Supreme Court has also said, however, that there may be cases in which a procedure of the state "involves such a probability that prejudice will result that it is deemed inherently lacking in due process" not to change venue, and actual prejudice need not be shown. Estes v. Texas, 381 U.S. 532, 542–543, 85 S.Ct. 1628, 14 L. Ed.2d 543 (1965). An example of the extreme state of affairs that would justify abandoning the requirement of proof of prejudice is the case of Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), well known for the massive antagonistic publicity attending the trial in the news media. The Court does not feel that the evidence in this case is of sufficient proportions to indicate such a probability of prejudice surrounding petitioner's trial in 1943.

Applying these standards, we turn to a consideration of the evidence in this case.

The Court has been provided with complete transcripts of petitioner's trial, and the subsequent hearings, along with copies of all relevant court orders and opinions. In addition, at the hearing before this Court respondent presented witnesses who were serving as coroner and assistant district attorney at the time of petitioner's criminal trial. Their testimony was that the mood of the town did not seem to be against petitioner at the time of his trial, and that, in their opinion, it was not error to hold the trial in Lawrenceburg. Statements by the judge who presided at petitioner's criminal trial, and the special prosecutor who assisted the state in prosecution of the case must be evaluated on the issue of the atmosphere in Lawrenceburg at the time of the trial.

The Honorable Joe M. Ingram, Judge, 11th Judicial Circuit, presided over petitioner's trial, and at his initial post-conviction proceeding. In the latter proceeding, Judge Ingram ruled that petitioner had not received a fair trial, that his application for the writ of habeas corpus should be granted, and bond allowed pending a retrial.

At the conclusion of his Findings of Fact, filed on August 8, 1966, Judge Ingram stated:

> That the general feeling of the Court, the Special Prosecutor and the Attorney-General's Office was one of vindictiveness toward the petitioner who stood accused of the murder of their friend, to the extent their entire motivation was to the conviction of the petitioner as quickly as possible.

In his opinion and judgment Judge Ingram also stated:

> It is almost a farce, on the face of the record [sic] to say that under present day standards that the feeling was so high that, you might say, an insignificant child, had to be carried out of the county for safekeeping over the alleged murder of the High Sheriff and a well respected citizen of the County, that he could have had a fair and impartial trial in this county under those circumstances.

> The Court is of the opinion that the Attorney-General's Office failed in even allowing a trial to take place as

soon as it did under those circumstances then prevailing. \* \* \*

The Court is of the opinion that this court was derelict in its duty to the defendant to allow that condition to exist, especially under modern concepts of criminal justice and certain mandates of the Supreme Court of the United States. The defendants' constitutional rights were violated by the Attorney-General's Office and also by this Court in allowing this situation to exist, the defendant should have had a change of venue. \* \* \* [T]he Court was derelict in its duty in not appointing local counsel to represent or assist in the representation of this defendant.

Special Prosecutor Noble L. Freemon submitted a sworn statement to the trial court which conducted petitioner's first hearing on his writ of habeas corpus, and this statement has also been admitted in evidence without objection before this Court.

In his affidavit, Mr. Freemon states:

Cleve Weathers had made a good sheriff.

There had, however, developed personal enmity between Cleve Weathers and Ira Leighton. Ira was hated by practically all of the peace officers of the County. \* \* \* The family asked me to assist in the prosecution of the case. I did this without any charge whatsoever.

\* \* \* \* \* \*

Ira Leighton did not get a fair trial. He had no adequate legal representation. He could not have gotten a fair trial in Lawrence County at that time. Any able lawyer could have gotten a change of venue by any kind of diligent effort. This was not done. Any good trial lawyer could have held his sentence down (before any fair or reasonably fair jury) to the maximum for voluntary manslaughter.

\* \* \* \* \* \*

I have never been proud of my part in this lawsuit. It has weighed on my conscience ever since the trial. I do not like to see anyone get a raw deal and this boy did get it in this trial and I was a party to it.

The respondent asserts that petitioner did get a fair trial and that this can be conclusively shown by an examination of the trial record. It is pointed out that petitioner's attorney filed a motion for a change of venue, attempted a diligent defense of the case, and compiled a lengthy bill of exceptions for petitioner's appeal from his conviction. Respondent's witnesses at the hearing in the present proceeding stated that, in their opinion, there had been no general prejudicial feeling in Lawrence County at the time of the trial that would have prevented petitioner from obtaining a constitutionally fair trial. An examination of the transcript of the hearing on the motion for change of venue sheds additional light on the atmosphere in which petitioner was tried and convicted, however.

This colloquy between petitioner's attorney [P.A.] and the judge [J.] occurred at the hearing:

J.    What do you think about the date for the trial?

P.A.    It's a little bit early, but that's what the average folks want, and you did the thing that was popular with the mass of the people when you set that date. I think there'll be less trouble by trying it early than there would be later on.

J.    That's provided you get ready and prepare the defense?

P.A.    Yes.

P.A.    Don't you think it would be, with this sentiment, don't you think with just a little later that that would quiet down?

J.    Naturally time. heals wounds, naturally it does that. But I still think the time is all right, I think that it would be all right.

Another exchange at the hearing between petitioner's attorney and a witness [W.]:

P.A.    We wouldn't want to keep the case here, and then have some-

thing unlawful happen; what is honestly, your opinion?

W. I believe a competent, impartial jury could be found here in Lawrenceburg, but they feel pretty strongly, just the majority of the opinion now is that he's just been murdered, in fact, that's the way you hear them talk. Of course, these men who have expressed that kind of opinion, nevertheless might become jurors.

Other evidence adduced with respect to the mood of Lawrenceburg at the time petitioner was tried can be found in affidavits submitted by petitioner and his father in support of a motion for a new trial made immediately following the trial and conviction. Petitioner stated in his affidavit (written in the third person):

At one time, the Sheriff came near his seat, in a low tone spoke to the Judge, who had come off the Bench, down where his counsel was called into the conversation, and he who sat at the right of his counsel and farther from the corner of the Jury Box than his counsel was, and further away from the conversation than the Jury were, and the Jury were intent and looking carefully at those in conversation, and announced that he had positive information that affiant was going to make an effort to escape, and that his sister, who sat near him, had a pistol in her purse. His counsel said, "Search them at once," so the father, the sister, and all were taken into the witness room, which was at the right of the Judge, and in the sight of the Jury, and all examined, and no weapons found, and he had not made any threat to escape, or anything of the kind.

Petitioner's father confirmed this incident and added:

That in this search he gave up his little, short, pocket knife and the jailer, Will Anthony, who got angry, mad and laughing when he was testifying came out and met him with a pistol in his hand, drew it and told him not to move.

Petitioner's father also furnished the following information in his affidavit:

That the excitement and feeling against Ira Leighton was very intense and the feeling towards him was very high and so high that at one time he was struck by some person unknown to him in the left eye, knocked down, and kicked. At this time he had done nothing knowingly and couldn't ascertain who it was until some time later and he ascertained that it was the brother of the present Sheriff of Lawrence County.

The Tennessee statute allowing change of venue in criminal cases provides:

*Undue excitement as ground for change on defendant's application.—* In all criminal prosecutions the venue may be changed, upon the application of a defendant, when it is made to appear satisfactorily to the court that, from undue excitement against the prisoner in the county where the offense was committed, or any other cause, a fair trial could probably not be had. T.C.A. § 40–2201.

Tennessee courts have consistently held that the determination of whether to grant a change of venue in any case rests within the discretion of the judge:

T.C.A. § 40–2201 and cases cited thereunder establish, beyond doubt, that the question of change of venue is one largely within the discretion of the trial judge and there must be a clear abuse of this discretion for this Court to reverse his action. Swain v. State, 219 Tenn. 145, 151, 407 S.W.2d 452, 455 (1966).

On the issue of venue, the trial judge, Honorable Joe M. Ingram, said in his opinion granting the writ of habeas corpus in 1966:

The Court is of the opinion that the Attorney-General's Office violated the constitutional right of this defendant by resisting an application for a change of venue under the circum-

stances that prevailed at the time of this trial.

\* \* \* \* \* \*

The defendant's constitutional rights were violated by the Attorney-General's Office and also by this court in allowing this situation to exist, *the defendant should have had a change of venue.*

The trial judge further stated that petitioner's appointed counsel did not adequately present the motion for a change of venue or for a continuation in view of the fact that so short a period of time had elapsed between the killing and the trial.

Apart from the statements of the judge in his Findings of Fact and Conclusions of Law in petitioner's first state habeas corpus hearing, and those of the special prosecuting attorney in an affidavit, the record in petitioner's case is equivocal. The trial of petitioner, an unpopular youth with previous encounters with the law was held only three weeks after the killing of the newly-elected and popular sheriff. While respondent claims that the trial was conducted fairly and impartially, there is considerable evidence that feelings against petitioner among the Lawrenceburg populace were running high at the time. Yet there was also testimony that petitioner did receive a fair trial. Moreover, that several panels of veniremen were exhausted in order to seat a jury may well indicate the care with which the voir dire was conducted by the court and counsel. Thus the trial judge's post-trial statements are the principal bases for a conclusion that petitioner did not receive a fair trial.

■ The Court is of the opinion that it would be a highly questionable practice to accept the statements of the trial judge, made some twenty-three years after the fact, directly in conflict with his previous official ruling. The trial judge had opportunity in 1943 to grant a change of venue and a new trial. He declined to do either. It may be that this was error, as the judge stated, "especially under modern concepts of crim-inal justice and certain mandates of the Supreme Court of the United States." Yet the judge's opinion was reversed by the Supreme Court of Tennessee, and the second state habeas corpus hearing before another judge went against petitioner on the same issues. To accept now ex post facto conclusions as evidence in the present proceeding would be to expose many convictions to serious doubt when a presiding judge or other state official has in later years experienced a change of mind in a case or about a particular ruling, perhaps after being subject to pressures of publicity and attempts to obtain parole or clemency. This Court has the duty of determining independently of the decisions of the state courts whether there was a violation of due process of law. The trial judge in his official capacity was twice presented opportunity to exercise his discretion to grant a change of venue or a new trial and both times he declined. There is evidence in the record to support his exercise of discretion. His later statements, judicial and extrajudicial, should not be afforded conclusive effect in our independent evaluation of the record. Despite the conclusory statements of the judge the Court is of the opinion that petitioner has not carried the burden of proof that there was sufficient prejudice in the community so as to render trial there a violation of due process. *See* Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Odom v. Nash, 226 F.Supp. 855 (M.D. Mo.1964).

■ Petitioner here cites several other aspects of his trial which he believes deprived him of his right to due process of law. · Particularly, petitioner alleges and insists that he was denied due process of law in that he was not afforded adequate assistance of counsel. The burden of proof in this matter is on the petitioner. The several allegations of the complaint with respect to counsel reduce themselves to the insistence that the time allowed by the trial court for preparation of the defenses was insufficient as a matter of law.

■ It has been held that "the shortness of time allowed by the Court for preparation for trial" could amount to a denial of the constitutional right to the effective assistance of counsel. Townsend v. Bomar, 351 F.2d 499 (6th Cir. 1965). The instant case is distinguishable from *Townsend,* however. In *Townsend* defendants were indicted on October 7, 1958, for allegedly participating in a prison riot on July 1, 1958. The defendants were brought to trial two days later on October 9, 1958, when they first learned of the indictments, and had less than two hours to consult with appointed counsel. The trial concluded on October 10, 1958. In the instant case, although there is some evidence that appointed counsel had some difficulty in consulting with his client, the Court does not find that the petitioner has carried the burden of proof in this matter. Three weeks elapsed between arrest and trial, and counsel agreed with the trial court that he thought he had had sufficient time to prepare for the trial. In all other respects, the record reveals that appointed counsel was conscientious in his efforts in behalf of petitioner. A rigorous voir dire was conducted, exhausting almost three full panels of veniremen. The technical record of the trial reveals full cross-examination of the state witnesses and presentation of defense witnesses. Appointed counsel made timely motions for a change of venue and a new trial, and also briefed and argued petitioner's appeal before the Supreme Court of Tennessee. In sum, the record does not justify the conclusion that as a matter of constitutional principle defendant was denied the right to effective counsel.

The Court fully concurs in the opinion of Judge Fred Bibb, who was the presiding judge in the second habeas corpus hearing in the state court. His opinion is a full exposition of the issues involved and is attached as an appendix.

Therefore, it is ordered that the petition for a writ of habeas corpus should be, and hereby is, dismissed.

APPENDIX
MINUTES OF THE 24th DAY OF NOVEMBER, 1967

"Court Met Pursuant to Adjournment, Present and Presiding The HONORABLE J. FRED BIBB, JUDGE OF THE CRIMINAL COURT, THIRD JUDICIAL CIRCUIT OF TENNESSEE, RETIRED, Sitting by Designation of the Chief Justice, When the Following Proceedings were had and Ordered to be Entered of Record, to-wit:

STATE EX REL:
IRA LEIGHTON

VS.                                          NO. 8664

C. MURRAY HENDERSON, WARDEN
MEMO OPINION AND ORDER
DISMISSING PETITION
AND
REMANDING PRISONER TO
PENITENTIARY

This petition for Habeas Corpus was assigned to this Court for full evidentiary hearing and trial de novo by designation of the Chief Justice by order and letter of April 6, 1967.

Hearing thereof was delayed until November 7, 1967, because relator Leighton was not in custody of the Warden, and was not returned to his custody by Ohio Authorities until October 21, 1967.

This Court has considered the entire record in the case, including the original petition, the amendment thereto, the answer of the respondent Warden, the certified transcript of the entire proceedings of the original trial, February 1st to February 4th, 1943, filed as exhibit to said answer, the entire record of the Habeas Corpus hearing held July 12, 1966, the stipulation of counsel, the affidavit and testimony of Hon. Noble L. Freemon, special counsel for the State, and the testimony of Hon. Joe M. Ingram, Trial Judge of the 1943 trial, from all of which the Court finds as follows:

The issues raised by the pleadings are (1) Failure to take relator before a committing magistrate, (2) Relator was not given a preliminary hearing, (3) Ineffective representation by Court appoint-

ed counsel, (4) Failure of Trial Judge to change venue, (5) Relator's Court appointed counsel had not been given adequate time to prepare for trial, which was held too soon, and finally (6) The State through its special prosecutor should have agreed to a change of venue.

As to Issues (1) and (2), it appears from the record of the 1943 trial that at the time of the commission of the offense on January 12, 1943, the Grand Jury of the County was in session. Relator was indicted on January 14th, by this Grand Jury, without a preliminary hearing. This does not raise any constitutional question. The Statute T.C.A. 40–402 authorizes it, and the case of James D. Dillard v. Bomar, Warden, U. S. Court of Appeals, 6th Circuit, 342 F. 2d 789, specifically so rules.

As to Issues (4) and (6), they not only fail to raise any constitutional questions, but each have been ruled upon adversely to relator by the Supreme Court of Tennessee, which Court on January 8, 1944, by memo opinion prepared for the Court by Mr. Justice Chambliss, in affirming the judgment of the Trial Court on relator's appeal, specifically held: (1) there was no error in the Trial Court's refusal to grant a change of venue; (2) that the record showed a fair and impartial jury had been obtained; (3) that the record failed to disclose that relator had to exhaust all his peremptory challenges in the selection of the jury. The record further shows that a jury was obtained in less than two days which, in this Court's opinion, was less than the usual time required in cases of this magnitude.

Issues (3) and (4): These issues really raise only one question, and to this Court, raises the only question in this case. That question is, was this relator upon his original trial in 1943 furnished competent counsel, and did this court appointed attorney ably represent him as an advocate.

Of course, it is recognized that by Federal and State Constitutions, and by Statutes in Tennessee, T.C.A. 40–2002 and 40–2003, for more than a hundred years before Gideon, a defendant is en-

titled to counsel, and if unable to employ one to have the Court appoint one for him.

It is also recognized that Tennessee as well as Federal decisions too numerous to list here, hold that such a defendant is entitled to effective assistance of counsel, who must act as an advocate for defendant. A failure of either or both is a failure of due process and a denial of the constitutional right to a fair and impartial trial.

This being the law, this Court finds from this proof and from the entire record as follows:

On the very day relator was indicted, January 14, 1943, the Trial Judge, protecting him of his right to counsel, appointed Hon. R. E. Dotson, an attorney of Pulaski, a city eighteen miles away in the adjoining county to represent him. Having in the meantime obtained an affidavit from the relator therefor, two days later filed said affidavit and made a motion for a change of venue, alleging hostile feeling towards relator was such as he could not obtain a fair trial in Lawrence County. Five days later when said motion was heard, he introduced evidence, the State introduced opposing evidence, and after said hearing the Trial Judge overruled his motion and ordered the case set for trial February 1st.

Mr. Dotson, at his own expense, went to the jail at Nashville, 75 miles away, where defendant had been lodged for safekeeping and interviewed him. The defendant wrote out a full statement of his account of the homicide, which statement he swore on the trial was a true statement and gave it to Mr. Dotson. Whether he interviewed him for twenty minutes or twenty hours can make no difference because at no time did Mr. Dotson request additional time to prepare for trial and he was ready for trial, and announced ready for trial on February 1st. From his interview and from this written statement of defendant's he had from January 14th to February 1st to interview the State's witnesses, and to prepare defendant's own

defense, which was self-defense. He introduced several witnesses on behalf of the defendant in this effort. In the very nature of the offense as to place, witnesses, as to facts on both sides were few.

This Court has read every word of the 1943 proceedings and finds from the reading that Mr. Dotson by his questions on cross-examination of State's witnesses, by his direct-examination of the relator and his witnesses, by his objections and exceptions to what he considered inadmissable testimony, he understood and knew the issues, he knew the State's evidence, he at all times bore in mind relators defense of self-defense, he was capable, faithful, and vigorous in his advocacy of relator's defense and rights. By timely objections and exceptions, he preserved to relator his rights on appeal, in event of a conviction.

Upon the conclusion of the trial, after verdict, he filed a timely motion for a new trial in which he assigned twenty-four grounds of alleged error. A reading of this motion shows without a doubt he raised every possible question which could be raised.

Upon the overruling of the motion, he duly excepted, and thereupon made a motion in arrest of judgment. This being overruled he duly excepted and prayed and was granted an appeal for relator, to the Supreme Court.

Above and beyond his duty to relator, he paid out of his own pocket, the money for the Bill of Exceptions; this, it is believed by this Court, to insure that relator might have the benefit on appeal of all questions of error raised during the trial, not appearing upon the technical record.

In due time, he filed in the Supreme Court a scholarly and comprehensive brief, assignment of errors, and argument, therein assigning as error for appellate review each and every question he had raised in his motion for a new trial. This brief was twenty-six legal cap sized pages long, and in every respect complied with the rules of the Supreme Court.

But his efforts were to no avail. On January 8, 1944, the Supreme Court rejected his contentions and affirmed the judgment of the Trial Court. From this record of the 1943 trial, it is this Court's opinion that Mr. Dotson by his faithful, energetic, and intelligent representation of this relator was, in fact, successful, in that he succeeded in saving the relator from a sentence of death in the electric chair.

From the testimony of Hon. D. R. Wade, President of the Pulaski Bar Association, Judge David Rhea, Messrs, Charles E. Hagen and David Cheatham, all reputable members of the Pulaski Bar, all having practiced with and against Mr. Dotson in trials of lawsuits, this Court finds Mr. Dotson was at the time of the 1943 trial a mature man, a graduate of Vanderbilt Law College, a member in good standing of the Tennessee Bar Association, a capable, energetic, and resourceful lawyer who was experienced, and had a wide criminal law practice. He prepared his case well and gave his client's 'his all' as one of the witnesses said. (1966 trial, page 57).

To the Court he displayed everyone of these characteristics in the trial of this relator in 1943.

The record further shows that in 1943, the Trial Judge in overruling his motion for a change of venue (1943 Record, page 28) said, 'Mr. Dotson, I know you were appointed by the Court to represent the boy, and I appreciate your efforts in the case, and I feel like he's going to be well represented'.

The record further shows that Hon. Nat Tipton, State's attorney on appeal known [to] all lawyers in Tennessee to be man of great knowledge, especially criminal law, but not one to praise or· commend when such was not due, wrote in his reply brief in this 1943 case (1966 Record, page 87). 'Some twenty-six assignments are presented by diligent counsel'.

Mr. Justice Chambliss in his opinion (1966 Record, page 100) said, 'Diligent counsel has presented a large number of assignments of error'.

Besides his own testimony, the relator in this present hearing presents the testimony of Nolan Coffey, Joe Lee Johnson, and L. L. Hollis, all of whom testify as to whether or not relator could obtain (in 1943) a fair trial in Lawrence County; none testify that he did not get a fair trial, and as Mr. Johnson testified (1966 hearing transcript, page 32), 'he couldn't say that he didn't get a fair trial before the jury'; together with the affidavit and testimony of Mr. Freemon and Hon. Joe M. Ingram, Trial Judge in 1943 trial. Mr. Freemon testifies relator did not have competent counsel and says any good lawyer could have obtained a change of venue, and could have succeeded in getting a jury to return a verdict of voluntary manslaughter leaving the impression that he thought Mr. Dotson was not a good lawyer.

This 1943 record was read with Mr. Freemon's conclusions in mind, and, while no where does he point to any specific instance where relator was in anyway prejudiced in the trial, the record affirmatively shows that no where, either in direct-examination of State's witnesses, in cross-examination of defendant and his witnesses, in remarks to the Court, in side bar remarks, or in any other way, was he prejudiced or taken advantage of by Mr. Freemon. In fact, this record shows Mr. Freemon was careful as special prosecutor to guard the rights of the relator, as well as preventing prejudicial and probable reversible error from getting into the trial. As an illustration of this, Mr. Freemon, in the absence of the jury, in urging the Trial Judge to permit him to prove a Juvenile Court record of the relator, which the Court very properly refused to do, and held it not competent, Mr. Freemon said this, 'I don't believe it's worth taking a chance to get an error in the record and I'm going to withdraw the question'. (1943 Record, page 160)

Again he repeated: 'I don't want to take any chances, I'll withdraw that question.' (1943 Record, page 161)

The record shows this matter was never mentioned again.

The other conclusion of Mr. Freemon, that any good lawyer could have gotten a manslaughter verdict, seems to this Court to be wholly uncalled for. This 1943 record shows beyond a reasonable doubt by the testimony of at least five witnesses for the State, introduced before the jury by Mr. Freemon, that on three different occasions this relator had threatened to kill the deceased if he ever arrested him or put him in jail. This evidence was admissible under Mullendore vs. State, 183 Tenn., page 53, [191 S.W.2d 149,] for the jury to consider on the question of premeditation, a necessary ingredient of murder in the first degree.

Mr. Freemon loses sight of the words of the Supreme Court in 1944 when it said, 'Moreover, reviewing the record * * * we think no other jury in any other jurisdiction would have reached a different verdict'. (1966 Record, page 101)

The conclusion of Judge Ingram are that he believes *now* there was such hostile feeling *then* that relator did not get a fair trial, and that he now feels the defendant was not properly represented by appointed counsel. These are conclusions. No specific instance is pointed to in order to justify them.

With all respect for His Honor Judge Ingram, it is this Court's opinion that he now cannot be heard to make such statement, even they be only conclusions. We all recognize that time and many hundreds of cases dims memory, confuses facts. This 1943 record affirmatively shows the thoughts, opinion and judgment the same Trial Judge had when the case was tried. What were they? (1) Upon overruling relator's motion for a change of venue he made the statement heretofore copied (1943 record, page 28) and will not be repeated here; (2) upon overruling the motions for a new trial and in arrest of Judgment, he said, 'Gentlemen, in this case now, the State of Tennessee vs. Ira Leighton, the Court doesn't feel that there are any merits in any of the assignments of error or in any of the grounds for his motion for a

new trial. The Court is also satisfied of the guilt of this defendant beyond a reasonable doubt, and is also satisfied with and approves the verdict of the jury in this case, and accordingly overrules the motion for a new trial. I'm overruling the motion in arrest for the same reason'. (1943 record, page 227)

Moreover, as shown by Exhibit B to Respondent's answer (1966 record, page 50) on May 5, 1964, this Trial Judge wrote the Board of Pardons and Paroles recommending release of this relator, not because he had been denied a fair trial, not because he hadn't approved the verdict of the jury, and he himself had not found this relator guilty beyond a reasonable doubt—but because relator was a poor, young man with no chance in life who had made a good prisoner and in his opinion had served sufficient time for his crime.

This Court has spent considerable time researching the authorities to find law upon the subject of a judge attempting to impeach and nullify his judgment. Frankly, I can find none. However, as Tennessee makes the Trial Judge the thirteenth juror, Curran vs. State, 157 Tenn., page 7, [4 S.W.2d 957,] it is my opinion, he stands in the same position as a trial juror who attempts to do so. It is well settled that the juror will not be permitted to do so. Norris vs. State, 22 Tenn., page 333 (1842); Batchlor [Batchelor] vs. State, 213 Tenn., page 649 [378 S.W.2d 751] (1964).

But if this Court should be wrong in this conclusion, the present testimony of the trial judge is contradicted by the entire record and by his own acts and words throughout the 1943 trial as heretofore indicated. Moreover, in only two instances during that trial does the record show the State sought to introduce testimony which probably would have been prejudicial if admitted. One was when Mr. Freemon sought by proof in chief to prove deceased's good character as an officer (1943 record, pages 126, 127); the other was, when he asked the relator, on cross examination about his record as a juvenile (1943 record, pages 158, 159, 160). In each instance, Judge Ingram zealously protected the rights of the relator, excused the jury from the courtroom, and, after indicating he would sustain relator's attorneys objections, the prosecution withdrew the questions. In addition to this to insure the trial jury from possible outside influence, he appointed and swore in two officers with the jury instead of the usual and customary one officer. (1943 record, page 12)

Judge Minton in U. S. ex rel. Weber vs. Ragen, Warden, 7 Cir., 176 F. 2nd, 579, cert. denied [338 U.S. 809, 70 S.Ct. 49, 94 L.Ed. 489], said on page 586:

'As to the requirement under the Fourteenth Amendment, the services of counsel meet the requirements of the due process clause when he is a member in good standing at the bar, gives his client his complete loyalty, serves him in good faith to the best of his ability, and his service is of such character as to preserve the essential integrity of the proceedings as a trial in a court of justice. He is not required to be infallible. We know that some good lawyer gets beat in every lawsuit. The printed opinions that line the walls in our offices bear mute testimony to that fact. His client is entitled to a fair trial, not a perfect one.'

In U. S. ex. rel Darcy vs. Handy, Warden, [3 Cir.] 203 Federal 2nd, 407, page 427, it is said:

'It is true that a denial of due process of law by the State would result if the representation of a defendant by his counsel should be so lacking in competence or good faith that it would become the duty of the trial judge, or the prosecutor as officers of the State to observe and correct it. For in such a trial the defendant would be practically without representation and it would therefore be but a farce and a mockery of justice. It is the duty of both the trial judge and the prosecutor to see that the essential rights of the defendant are preserved. As officers of the State their failure to do so is imputed to the state. But they and through them the State

may not be convicted of a denial to the defendant of due process of law in this regard, unless the incompetence of the defense is so apparent as to call for intervention between counsel and client.'

In U. S. vs. Wright [Wight], 176 Federal 2nd, 376, a case where appointed counsel had only fifteen minutes before entering a plea of guilty for defendant, and the effort was to set aside the judgment under Federal statute 28–2255 because defendant claimed he did not have effective representation by counsel, the Court on page 379 siad [said]:

'Certainly the amount of time and effort of preparation required to provide effective representation will vary with the nature of the charge, counsel's familiarity with the law and the facts. Moreover, time consumed in oral discussion and legal research is not the crucial test of the effectiveness of the assistance of counsel. The proof of the efficiency of such assistance lies in the character of the resultant proceedings, and unless the purported representation by counsel was such as to make the trial a farce and a mockery of justice, mere allegations of incompetency or inefficiency of counsel will not ordinarily suffice as grounds for the issuance of a Writ of Habeas Corpus, or the granting of a petition pursuant to Section 28–2255.'

See also:

State ex rel Callahan
vs.
Henderson, Warden [220 Tenn. 417]
417 S.W.2nd, 789

Schaber
vs.
Maxwell [6 Cir.]
348 Federal 2nd. 664

Scott
vs.
U. S., 6 Cir.,
334 Federal 2nd, 72.

The record of the 1943 trial shows upon its face no denial of due process or other constitutional rights, consequently, the burden is upon the relator to show by a preponderance of the evi-dence that same has been denied him. This he has not done. Not only has he failed to carry this burden, but it is the opinion of this Court that the entire record reveals beyond doubt that none of his constitutional rights was denied him, that he had the effective assistance of competent experienced counsel, who ably, faithfully, and vigorously fulfilled his duty as an advocate of relator's cause in the best traditions of the legal profession. Unfortunately, Mr. Dotson has passed on and cannot be here to defend himself but this record amply does so.

It is therefore the judgment of the Court that the petition for Habeas Corpus be and same hereby is dismissed at the cost of the relator for which execution will issue.

The relator is hereby remanded to the custody of the Warden.

/s/ J. Fred Bibb
Judge—Retired
/s/ J. Fred Bibb
J. FRED BIBB, JUDGE RET.

STATE EX REL
IRA LEIGHTON

VS.                    NO. 8664

C. MURRAY HENDERSON, WARDEN

### ORDER

The Relator, IRA LEIGHTON, excepts in toto, to the MEMO OPINION AND ORDER DISMISSING PETITION AND REMANDING PRISONER TO PENITENTIARY entered on November 24, 1967, and prays an appeal to the next term of the Court of Criminal Appeals at Nashville.

The Court is pleased to grant the same and the Relator is granted ninety (90) days from and after the entry of this Order within which to prepare and file his Bill of Exceptions.

It is ordered that the entire record of the 1943 trial shall be placed in the record of this hearing and that the record in this case previously made on Appeal to the Supreme Court at Nashville, shall be sent upon this Appeal in its present certified form.

It is further ordered that the Bill of Exception shall be presented to Attorneys representing C. Murray Henderson at least ten (10) days prior to expiration of said ninety days herein granted Relator for perfecting his appeal.

It appearing to the Court that the Relator is confined in State Penitentiary, that his original petition was filed and proceeded upon in Forma Pauperis, that he is without funds and is therefore relieved of filing an appeal bond.

This the 14th day of December, 1967.

J. Fred Bibb
JUDGE"